UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 5:25-cr-00114-GFVT-EBA-1 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | **&** |
| MAYCOL MEJIA ARANDA, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

The Second Amendment protects the right of "the people to keep and bear Arms." U.S. Const. amend. II. This right is not absolute, but subject to proper regulation by the State. For instance, the United States Code prohibits an alien "illegally or unlawfully in the United States" from possessing a firearm. 18 U.S.C. § 922(g)(5). Recent decisions from the Supreme Court and the Sixth Circuit set these laws on course for an inevitable collision. In this case, the issue before the Court is whether the enforcement of § 922(g)(5) against Defendant Aranda, a Special Immigrant Juvenile (SIJ) status alien, violates the Second Amendment to the United States Constitution.[1] For the reasons stated below, the Court concludes that it does.

## I

Neither party challenges Judge Atkins' account of the case's factual background. [*See* R. 33 at 1–3.] Aranda is a Honduran national who entered the United States illegally when he was fourteen years old. Aranda's father physically and sexually abused his mother, leading her to flee to the United States with Aranda and his siblings. Aranda also faced pressure from MS-13 to join

---

[1] This matter is before the Court on United States Magistrate Judge Edward B. Atkins' Report and Recommendation. [R. 33.] Judge Atkins recommends that the Court dismiss the indictment against Defendant Maycol Mejia Aranda. [*Id.* at 13.] The United States timely objected, and the matter stands ripe for adjudication.

their ranks. Aranda and his family entered the United States near Hidalgo, Texas in December of 2018 where Border Patrol agents took them into custody. After processing and release, the family moved to Lexington, Kentucky to be near extended family.

In Kentucky, Aranda obtained an order from the Fayette County District Court finding that his father abandoned him and that reunification was not viable. He applied for Special Immigration Juvenile (SIJ) status with United States Citizenship and Immigration Services (USCIS). USCIS approved Aranda's SIJ petition on October 29, 2020. In 2022, USCIS issued Aranda an amended I-797 Approval Notice which, in relevant part, permitted him to apply for employment authorization. He received a five-year employment authorization in December 2024 that is valid through December 2029. While in Lexington, Aranda enrolled in Paul Laurence Dunbar High School, began working after receiving authorization, and fathered a child who is a United States citizen.

On July 21, 2025, Lexington Police responded to a report of shots fired involving a motor vehicle. Officers alleged that Aranda fired shots into the air as another vehicle chased him. Police arrested him and charged him with four counts of wanton endangerment in violation of Kentucky law. On September 4, 2025, a federal grand jury indicted Aranda with one count of knowingly possessing a firearm as an illegal alien in violation of 18 U.S.C. § 922(g)(5). On December 4, 2024, Aranda moved this Court to dismiss the indictment against him, raising facial and as-applied constitutional challenges to § 922(g)(5). [R. 20.] This Court referred this matter to Magistrate Judge Edward B. Atkins on December 8, 2025. [R. 22.] On December 15, 2025, the Sixth Circuit issued a published opinion, *United States v. Escobar-Temal*, 161 F.4th 969 (6th Cir. 2025), which also addressed a constitutional challenge to § 922(g)(5).

Judge Atkins issued a Report and Recommendation, recommending that this Court dismiss the indictment against Aranda. Judge Atkins found that *Escobar-Temal* precludes Aranda's facial challenge. But Judge Atkins held that § 922(g)(5) was unconstitutional as applied to Aranda because Aranda's SIJ status creates a formal, regulable relationship with the United States government under the holding of *Escobar-Temal*. The United States objected to Judge Atkins' recommendation that this Court dismiss the indictment against Aranda.

## II

When a party files written objections to a Magistrate Judge's proposed findings and recommendations, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." *Id.* "A specific objection explains and cites specific portions of the report which counsel deems problematic.'" *United States v. Conley*, 290 F. Supp. 3d 647, 653 (E.D. Ky. 2017) (citation modified). The government raised two objections to Judge Atkins' Report and Recommendation. First, the United States "maintains that individuals illegally in the United States may not be considered part of 'the people' for purposes of the Second Amendment," while simultaneously "recognizing [that] *Escobar-Temal* is currently binding on this court." [R. 34 at 2.] Second, the government objects to the finding that 18 U.S.C. § 922(g)(5) is unconstitutional as applied to Aranda. [*Id.*] The Court addresses both objections in turn.

## A

The first issue is whether illegal aliens may be considered part of "the people" for purposes of the Second Amendment. This question arises in context of the Supreme Court's

framework for determining whether a firearm regulation violates the Second Amendment. In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court announced a two-step process for evaluating constitutional challenges brought under the Second Amendment. In analyzing such a challenge, courts must first determine whether the Second Amendment's plain text covers the defendant's conduct. *Id.* at 24. If it does, then the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

In *Escobar-Temal*, the Sixth Circuit applied the *Bruen* test to an illegal alien charged under 18 U.S.C. § 922(g)(5), the same statute used to indict Aranda. 161 F.4th at 972. There, the government argued that "individuals not lawfully present in the United States are not part of 'the people,' and do not, therefore, have Second Amendment rights." *Id.* The Sixth Circuit held that such individuals do have Second Amendment rights under certain circumstances and can therefore satisfy step one of the *Bruen* test. *Id.* at 975. "A historical analysis of 'the people' confirms that the term includes U.S. citizens as well as those with sufficient connections to the country that they are considered part of the national community." *Id.* The Sixth Circuit outlined the "sufficient connections" test to evaluate whether an illegal alien "has sufficient connections to this country to be considered part of the national community." *Id.* at 978. This test requires courts to "look holistically" at the facts, a task that courts are "well-versed" in performing. *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The United States simply states that they maintain the position that illegal aliens are not part of "the people" under the Second Amendment, notwithstanding the fact that *Escobar-Temal* binds this Court. [R. 34 at 2.] But the government titled its argument heading "Whether Aranda is Part of 'The People.'" [*Id.*] In the pursuit of thoroughness, the Court will construe this as a

4

challenge to Judge Atkins' determination that Aranda satisfied the sufficient connections test. The Court agrees with Judge Atkins that Aranda has. In *Escobar-Temal*, the Sixth Circuit found that several factors weighed in favor of considering Escobar-Temal as part of "the people" under the Second Amendment. 161 F.4th at 977–78. They noted that he "lived in the same community for approximately a decade," "consistently worked," had "two American citizen children," and had "no criminal convictions." *Id.* at 977. These factors similarly weigh in favor of Aranda. Aranda moved to Lexington after his initial detention in Texas, attended a Lexington high school, obtained a job, has an American citizen minor child, and had no criminal history before his arrest. This is satisfactory under the sufficient connections test to establish that Aranda is part of "the people" under step one of the *Bruen* analysis. Decisions of the Sixth Circuit bind this Court, and *Escobar-Temal* clearly answers this question.

**B**

The government next argues that "*Escobar-Temal* should not be read so broadly as to suggest that unlawfully present aliens have an inviolable right to possess arms whenever they develop a 'relationship with the state.'" [R. 34 at 3.] Aranda argues that § 922(g)(5) is unconstitutional as applied to him because his Special Immigrant Juvenile status establishes that he possesses a "formal, regulable relationship" with the United States government such that the historical analogues identified in *Escobar-Temal* do not justify his disarmament. [R. 31 at 24.] Judge Atkins concluded that SIJ status "creates a formal, regulable relationship with the United States government" and that § 922(g)(5)(A) is unconstitutional as applied to him.

Judge Atkins aptly noted that "there is, understandably, a lack of guidance on this question given the recency of the Sixth Circuit's opinion in *Escobar-Temal*." [R. 33 at 12.] The Court can identify a single reported case from this Circuit addressing the intersection of SIJ

status and the prohibitions of § 922(g)(5), and this case predates the decision in *Escobar-Temal* by several years. In *United States v. Santiago-Hernandez*, 113 F. Supp. 3d 966, 969 (W.D. Mich. 2015), Judge Robert J. Jonker dismissed a § 922(g)(5) indictment against an alien with SIJ status. He did this on the basis that the defendant's SIJ status gave him parole status and, as a person paroled into the U.S., could not be treated as an alien illegally or unlawfully in the United States. *Id.* Other courts outside of the Sixth Circuit reached similar results when confronted with this question. *See United States v. Garcia*, 707 F. App'x 231, 234–35 (5th Cir. 2017) (holding that SIJ status precluded defendant from liability under § 922(g)(5)).

The Government argues that *Escobar-Temal* "hinted at" the idea that that "those on Special Immigrant Juvenile status can appropriately be disarmed *regardless of whether they have entered into some rudimentary relationship with the federal government* because they have not yet been naturalized according to law and sworn an oath of allegiance." [R. 34 at 4] (emphasis added). Under the government's reading, Aranda could only have a "relationship with the state" if he naturalizes or takes an oath of loyalty to the United States. [*Id.*]

Desirable as this may be, that is not at all what the Sixth Circuit announced in *Escobar-Temal*. Had the Sixth Circuit wished to adopt the United States' position, they would have plainly said so. Instead, they wrote, "the justification [for disarmament] in the case of § 922(g)(5) is a lack of relationship with the United States government that makes it difficult to safely regulate the conduct of individuals who are unlawfully present and possess a firearm." *Escobar-Temal*, 161 F.4th at 985. If an individual "enter[s] into a relationship with the government that established the state's ability to appropriately regulate the individual," then disarmament under § 922(g)(5) would not be appropriate. *Id.*

6

Nowhere in the opinion does the Sixth Circuit articulate that this relationship only exists through formal naturalization. The relational concern does not boil down to naturalization status, but instead whether the government can effectively regulate a group of people. *See id.* at 983 ("[R]easons other than inherent violence or criminality can make it dangerous for a group of people to possess firearms. One of those reasons is a lack of relationship between the government and individuals of a group that make the group difficult or impossible to regulate.").

Escobar-Temal had no true relationship with the United States. He did not have any kind of documented status with the United States, had never appeared before USCIS, and seemingly had no *interaction* with the government before his arrest. Escobar-Temal was an alien truly living in the shadows outside of the government's reach. Such individuals are part of a group that is "difficult or impossible to regulate." *Id.* at 983.

On the other hand, Aranda plainly was not a member of a group outside of the government's authority. Congress created the SIJ program in 1990, giving SIJ holders "several benefits" including the ability to adjust their status, access federally funded education programs, and to receive preferential status when seeking an employment-based visa. [R. 33 at 8–9] (citing *Osorio-Martinez v. Att'y Gen. United States of Am.*, 893 F.3d 153, 163–64 (3d Cir. 2018)). To even qualify for SIJ status, Aranda had to submit biometrics to USCIS, register as an alien with the United States government, and regularly report to USCIS. [*Id.* at 9–10.] Failure to uphold these obligations includes imprisonment and removal. *See* 8 U.S.C. § 1306.

The Court agrees with Judge Atkins that Aranda has submitted himself to the authority of the government in exchange for the protections afforded by SIJ status. Aranda's SIJ status creates a formal, regulable relationship with the United States government. *See Rodriguez v. Perry*, 747 F. Supp. 3d 911, 918 (E.D. Va. 2024) ("Congress afforded [SIJ-status] aliens a host

of procedural rights designed to *sustain their relationship* to the United States[.]") (citation modified) (emphasis added); *Osorio-Martinez*, 893 F.3d at 171 (noting that the rights of SIJ designees "bespeak a *substantial legal relationship* between them and the United States") (emphasis added).

In many respects, an alien with SIJ status stands in a similar position to other documented, regulated alienage categories. "SIJ designees stand much closer to lawful permanent residents than to aliens present in the United States for a few hours before their apprehension," and are "a hair's breadth from being able to adjust their status." *Osorio-Martinez*, 893 F.3d at 174. The government's position that Second Amendment protections extend only to individuals who "naturalize[] according to law and sw[ear] an oath of allegiance" may be a desirable policy outcome, but it is not found in the caselaw on this topic. The Court, agreeing with Judge Atkins, is convinced that the relational requirement espoused in *Escobar-Temal* is met in this case. The government has not demonstrated that its proposed scope of § 922(g)(5), as applied to Aranda, is consistent with the Nation's historical tradition of firearm regulation where Aranda has a clear demonstrated relationship with the government. *Bruen*, 597 U.S. at 24.

**III**

Accordingly, and the Court being otherwise sufficiently advised, it is hereby ORDERED as follows:

1.  Judge Atkins' Report and Recommendation **[R. 33]** is **ADOPTED** as and for the Opinion of the Court.

2.  The United States' Objection to the Report and Recommendation **[R. 34]** is **OVERRULED**.

3.  Defendant Maycol Mejia Aranda's Motion to Dismiss the Indictment **[R. 20]** is

    **GRANTED**.

4.  Defendant Aranda's Motion to Suppress Statements and Evidence **[R. 21]** is

    **DISMISSED** as moot.

This 3d day of March, 2026.

Gregory F. Van Tatenhove
United States District Judge